IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 08-cv-00774-LTB-CBS

RE/MAX INTERNATIONAL, INC.,

        Plaintiff,

v.

FIRST AMERICAN RESIDENTIAL GROUP, INC., a Delaware corporation,

        Defendant.
_____

ORDER
_____

This matter is before me on a motion for summary judgment [**Doc #58**] filed by Plaintiff, RE/MAX International, Inc. ("Re/Max"), in which it seeks summary judgment in its favor on claims it asserted against Defendant, First American Residential Group, Inc. ("First American"). Re/Max also seeks, in the alternative, partial judgment in its favor against certain defenses raised by First American. First American opposes these requests. Oral arguments would not materially assist me in the determination of this motion. After consideration of the parties' briefs and exhibits, I GRANT IN PART and DENY IN PART the motion for the following reasons.

## I. BACKGROUND

Re/Max filed this lawsuit seeking damages for the alleged wrongful termination by First American of the parties' marketing agreement. Re/Max asserts a claim for breach of contract or, in the alternative, for unjust enrichment. In response, First American maintains that its termination of their marketing agreement was proper and, as such, there was no breach of contract.

Re/Max is engaged in the business of selling and servicing real estate brokerage franchises. First American provides title insurance services. On August 15, 2003, the parties entered into an agreement establishing a strategic business relationship whereby First American became the exclusive "Approved Supplier" of title services to Re/Max franchises, which, in turn, would "facilitate" the use of First American's services. In exchange, First American would pay Re/Max $600,000 per year.

This marketing agreement had a term of three years. It provided for termination in the event of default, insolvency, or change in control of the other party. In addition, the marketing agreement allowed termination for a "RESPA Event" which was set forth as follows in Section 8.4:

> Termination for RESPA Event: If any legal or regulatory action alleging a violation of RESPA is commenced against a Party or any of its Affiliated Companies with respect to the performance by such Party of its obligations under this Agreement, then such Party shall have the right to terminate this Agreement upon written notice to the other Party effective as of the date set forth in such notice.

Appendix A of the agreement defines RESPA as "the Real Estate Settlement Procedures Act of 1974, as amended." The agreement also contained a mutual representation that performance "will not . . . violate any law, rule or regulation applicable to it," and that there was no "action" or "investigation" pending against either party that involved the agreement.

In August of 2003, the Director of Compliance for the Colorado Division of Insurance (the "DOI"), Erin Toll, became aware of the agreement. Thereafter, on September 9, 2003, the DOI opened a formal complaint file and investigation into the parties' marketing agreement. On March 1, 2004, Bobbie Baca, a Senior Compliance Analyst with the DOI, sent a letter to an affiliate of First American requesting information about the marketing agreement, including the

circumstances attending the execution of the agreement and an explanation of why it did not violate "§§ 10-11-108(1)(c) and 10-4-415(1)(a), (c), (d), (f), C.R.S. and [Colorado DOI] Regulation 3-5-1(5) and (5)(e)." First American responded on March 19, 2004. Shortly thereafter the DOI investigation was placed on the "back burner."

After their initial marketing agreement expired, the parties executed an Amended and Restated Marketing Agreement on January 20, 2006. The termination provisions of the new marketing agreement remained generally the same, with the exception of Section 8.4 which was amended to allow *either* party to terminate the agreement upon the occurrence of a RESPA event.

On July 20, 2006, Ms. Baca at the DOI sent First American another letter seeking further information about the marketing agreement, as well as an explanation as to why the agreement did not violate Colorado DOI Regulation 3-5-1 Section 5.A.6.a. First American responded in a letter dated November 17, 2006.

Thereafter, First American sent a letter to Re/Max dated April 26, 2007, for the purpose of terminating their marketing agreement. The letter stated that it was terminating the marketing agreement pursuant to Section 8.4 and the "actions of the Colorado Division of Insurance." Re/Max responded, by letter dated May 30, 2007, indicating that it disagreed that Section 8.4 permitted termination and demanded that First American "continue to honor your contractual obligations." On July 10, 2007, Re/Max sent First American an invoice for the amount due pursuant to the marketing agreement, which First American did not pay. This lawsuit followed.

## II. SUMMARY JUDGMENT STANDARD

The purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, I examine the factual record in the light most favorable to the party opposing summary judgment, extending to that party all reasonable factual inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the movant carries its burden of showing the absence of a genuine issue of material fact, the non-movant must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

## III. ANALYSIS

Re/Max argues that First American's termination of their marketing agreement in April of 2007 was not valid and, as such, it is entitled to summary judgment for First American's breach of contract. In response, First American argues that termination was proper pursuant to Section 8.4 of the agreement, which allows for termination in the case of a RESPA Event.

The relevant language from Section 8.4 set forth in the agreement is as follows:

> <u>Termination for RESPA Event</u>: If any legal or regulatory action alleging a violation of RESPA is commenced against a Party . . . with respect to the performance by such Party of its obligations under this Agreement, then either Party shall have the right to terminate this Agreement . . .

In its motion seeking summary judgment, Re/Max argues that as a matter of law the DOI's investigation of the parties' marketing agreement – including the two letters sent to First American on March 1, 2004 and July 20, 2006 – does not constitute a "legal or regulatory action alleging a violation of RESPA" as set forth in Section 8.4. Re/Max contends that the investigation did not allege a violation of law and, even if it did, it did not allege a violation of RESPA as required by Section 8.4. In contrast, First American asserts that the DOI's ongoing investigation into the marketing agreement – from 2003 through the end of 2007 – alleged that the agreement violated various anti-kickback laws, including RESPA. As such, First American maintains that the DOI investigation constituted a RESPA Event under Section 8.4, and thus its April 2007 termination was proper.

The evidence related to the DOI's investigation of the parties' marketing agreement is as follows. In August 2003 the Director of the Real Estate Commission for the State of Colorado became aware of the marketing agreement, and referred the matter to the Director of Compliance at the DOI, Ms. Toll. Ms. Toll thought the agreement might violate insurance laws and regulations and, as such, she requested that the DOI "set up a complaint file and prepare an allegation letter to First American Title." The DOI opened a complaint file on September 9, 2003. On March 1, 2004, Ms. Baca at the DOI sent the first letter to First American seeking an explanation of why it did not violate certain Colorado State statutes and Colorado DOI regulations ("please explain why [the marketing agreement] would not be a violation of §§ 10-

11-108(1)(c) and 10-4-415(1)(a), (c), (d), (f), C.R.S. and Regulation 3-5-1(5) and (5)(e)"). First American responded, and the investigation was then put on the "back burner."

Then, in early 2005, as the result of an unrelated investigation into captive reinsurance agreements, First American entered into a stipulated settlement with the DOI in which it agreed to refund $24 million dollars to its consumers. Re/Max became aware of this settlement, and began to express internal concerns about the parties' marketing agreement at issue here in terms of its compliance with RESPA. The parties nonetheless renewed their marketing agreement in January 2006, with the only relevant change that *either* party could terminate under Section 8.4 for a RESPA event. Re/Max's corporate counsel who suggested the amendment, Larry Wall, testified in his deposition that the change was made in response to the "lessons learned " after the captive reinsurance investigation, which he described as a "RESPA Inferno."

Thereafter, on July 20, 2006, Ms. Baca sent First American another letter indicating that "while it has been over two years since the last correspondence, the Division still has concerns regarding this matter." The letter sought documentation and other information about the marketing agreement, as well as an explanation as to "why the predetermined annual fee paid by First American does not violate Regulation 3-5-1 Section 5.A.6.a and why it does not offset or subsidize RE/MAX (the settlement producer) in any way."

On August 16, 2006, John Dwyer, a First American officer charged with oversight of regulatory and legislative affairs, meet with Erin Toll to discuss the letter. In his deposition, Mr. Dwyer testified that during the meeting Ms. Toll indicated that she believed, based on his description of the parties' marketing agreement, that it violated Colorado statutes and regulations and "probably RESPA." In her affidavit, Ms. Toll indicated that while she remembers

discussing marketing agreements with Mr. Dwyer and others generally, she does "not recall ever discussing marketing agreements in detail." On September 5, 2006, Ms. Toll left her position with the DOI when she became the Director of the Colorado Division of Real Estate.

On November 8, 2006, Ms. Toll again met with Mr. Dwyer, as well as Vinnie Tracey, the President of Re/Max, and Re/Max's general counsel, Geoff Lewis. In his deposition, Mr. Dwyer recalled that at the meeting Ms. Toll indicated that she would have to see the agreement before she could render an opinion on it and, because she was no longer with DOI, she "wasn't really in a position to discuss it." Mr. Tracey and Mr. Lewis recall that the agreement was hardly discussed, but that Ms. Toll did indicate that, because she no longer was with DOI, "I don't do that anymore." Ms. Toll's affidavit states that at the meeting she "expressed concern with the agreements and I requested that RE/MAX provide me with additional information including the marketing agreements." After this meeting, First American responded to the DOI, in a letter dated November 17, 2006.

In the Spring of 2007, the parties discussed modifying their marketing agreement. Mr. Dwyer testified in his deposition that First American was concerned about their relationship with Re/Max and, as such, that they were attempting to modify the marketing agreement in response to the concerns raised in the DOI investigation. The parties were unsuccessful, however, and First American then sent its letter to Re/Max in April of 2007 purporting to terminate the agreement.

The DOI closed its complaint file on December 4, 2007, by noting that "the marketing agreement may be reviewed at a later date at a time when all [marketing] agreements in the industry are reviewed; no further action is necessary at this time." Thereafter, in April of 2008,

the State of Colorado Department of Real Estate launched an investigation of marketing agreements in the industry and, as part of that investigation, issued subpoenas to both Re/Max and First American. As a result of this industry investigation, two other entities have "settled" the matter after the Department of Real Estate asserted their marketing agreements violated RESPA and various state laws. That investigation remains pending as to both parties here.

**A. Limited Evidence**

As an initial matter, I address and reject Re/Max's contention that evidence related to the DOI's investigation prior to January of 2006 – when the second marketing agreement was executed – should not be considered in the determination of this motion. Re/Max asserts, for the first time in its reply brief, that First American is estopped from arguing that any action taken by the DOI before January 2006 constitutes grounds to terminate their marketing agreement. Re/Max relies on the following language in the parties' second marketing agreement, dated January 20, 2006, at Section 5:5:

> No Litigation. There is no action, suit proceeding or investigation pending or, to the knowledge of such Party, threatened against it before any Governmental Authority seeking to enjoin the transactions contemplated by this Agreement or that involves this Agreement or the transactions incorporated herein. There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority now pending against or, to the knowledge of such Party, threatened against or affecting it as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a material adverse effect on the business, assets, liabilities, operations, material contracts, prospects or condition, financial or otherwise, of such Party.

Because First American represented and warranted that "[t]here is no action . . . or investigation pending or . . . threatened against it before any Governmental Authority seeking to enjoin the transactions contemplated by the Agreement" in January 2006, Re/Max argues that

First American cannot now maintain the position that the DOI investigation prior to that time could constitute grounds for termination. However, I agree with First American that the actions contemplated by this language relate to possible pending lawsuits or litigation, not regulatory actions or proceedings as contemplated by the language in Section 8.4. Furthermore, it is undisputed that at the time the second marketing agreement was signed, in January 2006, the DOI investigation was on hold and that it did not move forward again until July 2006 when the DOI sent its second letter to First American.

## B. Ambiguity

Next, I address First American's argument that the applicable termination provision of the marketing agreement for a RESPA Event is ambiguous and, as such, that I should consider extrinsic evidence to ascertain its meaning. The provision at issue is entitled "Termination for RESPA Event" and provides that "[i]f any legal or regulatory action alleging a violation of RESPA is commenced against a Party . . . then either Party shall have the right to terminate this Agreement."

Whether ambiguity exists in a contract is a matter of law for the court to determine. *Centennial-Aspen II Ltd. Partnership v. City of Aspen,* 852 F.Supp. 1486, 1491 (D.Colo. 1994) (applying Colorado law). To ascertain whether contractual provisions are ambiguous, "the language used therein must be examined and construed in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter." *Cheyenne Mountain School Dist. No. 12 v. Thompson,* 861 P.2d 711, 715 (Colo.1993).

Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. *Ad Two, Inc. v. City and County of Denver ex rel. Manager of Aviation,* 9 P.3d 373, 376 (Colo. 2000)(*citing Browder v. U.S. Fidelity & Guaranty Co.,* 893 P.2d 132, 133 (Colo.1995)); *Geralanes B.V. v. City of Greenwood Village,* 583 F.Supp. 830, 838 (D.Colo. 1984)(ambiguity exists when "a contract provision is reasonably and fairly susceptible of more than one meaning").

First American asserts that the marketing agreement does not define what exactly constitutes a "RESPA Event," an action "alleging a violation of RESPA," or a "regulatory action." First American contends that those terms are susceptible to more than one meaning as evidenced by the fact that the parties have diverging positions as to the meaning of those terms; specifically, that Re/Max's interpretation requires that any "regulatory action alleging a violation of RESPA" mandates that the phrase "Real Estate Settlement Procedures Act" be specifically included within such allegation, while First American's interpretation is broader in that allegations do not need to be specific to RESPA in order to constitute a "regulatory action alleging a violation of RESPA."

The party's disagreement about the events necessary to trigger the termination provision does not make its terms ambiguous or result in more than one meaning. "The mere fact that the parties may have different opinions regarding the interpretation of the contract does not itself create an ambiguity in the contract." *Ad Two, Inc. v. Denver*, *supra*, 9 P.3d at 376-77. However, I agree with First American that the terms "RESPA Event," an action "alleging a violation of RESPA," or a "regulatory action" are ambiguous. While RESPA is clearly defined in Appendix A of the marketing agreement as "the Real Estate Settlement Procedures Act of 1974, as

amended" – which is the name of federal legislation found at 12 U.S.C. § § 2601, *et. seq.* – an "event" involving RESPA or a "violation of" RESPA is not. Likewise, a "regulatory action" is not defined and could mean a number of different legal or regulatory events or proceedings. Because the terms in Section 8.4 are susceptible to more than one reasonable meaning, its interpretation becomes an issue for the trier of fact to decide in the same manner as other disputed factual issues. *Centennial-Aspen II v. City of Aspen, supra,* 852 F.Supp. at 1492.

### C. "Allegation" of Law

I also address Re/Max's assertion that it is entitled to summary judgment for breach of contract because First American's attempt to terminate the marketing agreement in April of 2007 was not valid under conditions set forth in Section 8.4 – which provides either party the right to terminate their marketing agreement "if any legal or regulatory action alleging a violation of RESPA is commenced against a Party" – because the DOI investigation failed to "allege" a violation of law.

I conclude, however, that whether the DOI investigation did or did not "allege" that the marketing agreement violated the law is a disputed issue of fact. Re/Max contends that the DOI's "Problem Report Information Inquiry" form, which served to start the investigation, does not contain or refer to a legal violation. Additionally, Re/Max argues that the two letters sent to First American – in March of 2004 and July of 2006 – do not allege a violation of any statue or regulation, but rather only seek information, explanations, or express "concerns" rather than assert an allegation.

First, the provision is ambiguous. And, in any event, as argued by First American, there is sufficient contrary evidence that the DOI investigation did constitute an allegation that the

parties' marketing agreement violated the law. The investigation by the DOI, as the administrative body charged with overseeing and enforcing the industry, is, in an of itself, evidence that an allegation is being raised. Moreover, the letters sent to First American ask for an "explanation" as to why the agreement does not violate specific Colorado statutes and regulations. In fact, the subject line of the March 2004 letter was "Re: Alleged Violation of Colorado Statutes and Regulation 3-5-1." As such, I disagree with Re/Max's assertion that it is undisputed that the DOI investigation simply expressed concerns and sought information, or that the DOI letters were "merely letters of inquiry." Finally, contrary to Re/Max's argument here, the opinions of the DOI "regulators" during the course of their investigation – that the marketing agreement here possibly violated the law – constitutes further evidence that the investigation was alleging the same. As a result, I conclude that sufficient evidence exists, when viewed in the light most favorable to First American, to raise a genuine issue of material fact as to whether the DOI investigation served to "allege" that the marketing agreement violated the law.

**D.  RESPA Violation**

Re/Max also argues that even if the DOI investigation alleged a violation of law, it did not specifically allege "a violation of RESPA" as required for termination under Section 8.4.

RESPA is a federal anti-kickback statute found at 12 U.S.C. § § 2601, *et. seq*. Its purpose is to prohibit all kickback and referral fee arrangements whereby any payment or thing of value is furnished for the referral of real estate settlement business. *Echevarria v. Chicago Title & Trust Co.*, 256 F.3d 623, 627 (7th Cir. 2001); 12 U.S.C. § 2607(a). Re/Max argues that the DOI investigation alleged only a possible violation of Colorado law, and that it is undisputed that no allegation was made that the marketing agreement violated RESPA specifically.

In response, First American refers me to Mr. Dwyer's deposition testimony that Ms. Toll verbally opined, during their meeting on August 16, 2006, that she believe the marketing agreement "probably violated RESPA." In addition, First American points to the fact that at that time state regulators were increasing their oversight of the industry, including a similar DOI investigation regarding the legality of captive reinsurance agreements which was enforcing violations of both RESPA and Colorado law. Finally, First American notes that the DOI investigation letters sought an explanation as to the marketing agreements legality as related to, among other things, Colorado DOI Regulation 3-5-1. First American argues that this regulation is nearly identical to RESPA and, on January 1, 2007 – after the letters were written but before the investigation was closed in December of 2007 – that regulation was amended to include an express incorporation of RESPA. *See* 3 CCR 702-3, Regulations 3-5-1, § 12(C). First American maintains that the Colorado law cited in the DOI letters is the state version of RESPA and serves to prohibit the same conduct. While Re/Max argues that material differences exist between the RESPA and the Colorado legislation, I conclude that the evidence here is again sufficient to raise a genuine issue of material fact as to whether the DOI investigation alleged a violation of RESPA as required for termination under Section 8.4.

Therefore, because I have found that the language in Section 8.4 is ambiguous and, in addition, that genuine issues of material fact exist as to whether the DOI investigation served to allege that the marketing agreement violated RESPA, summary judgment should not enter in favor of Re/Max on its breach of contract claim.

## IV. DEFENSES

In this motion Re/Max alternatively seeks partial summary judgment in its favor on some of First American's defenses. *See* 10B Wright, Miller & Cooper, Federal Practice & Procedure § 2734 (a summary judgment motion may be made by plaintiff to test a defense's sufficiency).

First, Re/Max seeks judgment in its favor on First American's claim that the contract is not enforceable as illegal. Re-Max asserts that the marketing agreement did not violate RESPA, Colorado law or DOI regulations that prohibit a title company from giving or receiving remuneration for the referral of title insurance business.

In response, First American does not directly assert that the contract is illegal, but rather that Re/Max's interpretation of Section 8.4 – which would require that regulators would have to file a formal action or litigation specifically alleging a RESPA violation in order to allow termination – would violate public policy in that it would "force" a party to continue to perform under a agreement that a regulator has alleged is illegal. As such, First American claims that a contract provision cannot be enforced as it is clearly outweighed by public policy. *See In re Village Homes of Colo., Inc.*, 405 B.R. 479, 483 (Bkrtcy. D.Colo. 2009) ("[i]t is a long-standing axiom of contract law that a contract provision is void if the interest in enforcing the provision is clearly outweighed by a contrary public policy.")

However, I agree with Re/Max that the mere investigation or allegation that the contract might violate the law, without more, is insufficient for a court to void the contract as violating public policy. I must be cautious in finding contract provisions void as offensive to public policy "because to invalidate a provision of a contract freely entered is to infringe on one of the

essential freedoms of citizenry [which] is the right to bargain and contract." *Id.* (*quoting Superior Oil Co. v. Western Slope Gas Co.*, 549 F.Supp. 463, 468 (D.Colo.1982), *aff'd* 758 F.2d 500 (10th Cir.1985)). First American does not otherwise advance an argument that the contract is illegal or violates the law. Therefore, Re/Max is entitled to summary judgment in its favor on First American's defense that the parties marketing contract is void on the basis that it is illegal or violates public policy.

Next, First American fails to address Re/Max's contention that it is entitled to summary judgment on the defense that Re/Max acquiesced or agreed to mutually terminate their marketing agreement. First American does not raise any argument in response to Re/Max's assertion that this defense in untenable in that: rescission by mutual consent must be affirmatively pled; any evidence of any oral agreement by First American would not support a termination of the agreement because Section 8:4 required written notice; and First American cannot establish that Re/Max acquiesced in First American's alleged termination. Therefore, Re/Max is likewise entitled to summary judgment in its favor on First American's defense that Re/Max acquiesced in the termination of the marketing agreement.

ACCORDINGLY, I GRANT IN PART & DENY IN PART Re/Max's Motion for Summary Judgment Or, In The Alternative, for Partial Summary Judgment [**Doc #58**], as follows:

1) Re/Max's request seeking judgment in its favor on its breach of contract claim against First American is DENIED;


2) Re/Max's alternative request seeking partial judgement in its favor on First American's defense that the marketing agreement at issue here is illegal or violated public policy is GRANTED; and

3) Re/Max's alternative request seeking partial judgement in its favor on First American's defense that Re/Max acquiesced in the termination of the marketing agreement at issue here is GRANTED.

Dated: September  9 , 2009, in Denver, Colorado.

                                                BY THE COURT:

                                                s/Lewis T. Babcock
                                               LEWIS T. BABCOCK, JUDGE